**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| SANDRA JOHNSON CARTER, AS SURVIVING MOTHER OF MICHAEL ANTHONY CARTER JR. AND PERSONAL REPRESENTATIVE OF THE ESTATE OF MICHAEL ANTHONY CARTER JR., AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF MICHAEL ANTHONY CARTER JR.: SANDRA JOHNSON CARTER AND MICHAEL ANTHONY CARTER SR.<br><br>                                Plaintiffs,<br><br>        v.<br><br>LINDSAY CORPORATION, SAFE TECHNOLOGIES, INC., LINDSAY TRANSPORTATION, INC., BARRIER SYSTEMS, INC., VALMONT CORPORATION, VALMONT TRANSPORTATION, ARMORFLEX CORP. DALLAS JAMES and the installer of the X-Lite: GREEN ACRES CONTRACTING or COLLINSON, INC., or L.S. LEE INC. or PENN LINE SERVICES.<br><br>                                Defendants. | Case No: |

## COMPLAINT

Plaintiff, SANDRA JOHNSON CARTER, as the mother of Michael Anthony Carter and as Personal Representative of the Estate of MICHAEL ANTHONY CARTER JR. and on behalf of WRONGFUL DEATH BENEFICIARIES Sandra Johnson Carter and Michael Anthony Carter Sr., now appears, by and through counsel, in this case, which arises out of the injuries suffered attributable to the Defendants herein. Plaintiff states the following contentions:

## PARTIES, JURISDICTION, AND VENUE

1

1.     Plaintiff SANDRA JOHNSON CARTER is a citizen and resident of the State of Indiana, and appears as the estate representative for her son, Michael Anthony Carter, of Gwynn Oak, Maryland, who was a private first class with the U.S. Marines and was killed in a car crash with a product manufactured and sold by Defendants while on his way to the Salisbury Recruiting Office of the U.S. Marines.  Mr. Carter was born July 25, 1999 and was 18 years old at the time of the crash. Sandra Johnson Carter also appears on behalf of the wrongful death beneficiaries: herself and Michael Anthony Carter Sr. as parents of Michael Anthony Carter Jr.

2.     Defendant VALMONT INDUSTRIES, INC., organized in the State of Nebraska, which at all relevant times was doing business in the jurisdiction of this Court. Valmont Industries is a foreign for-profit corporation organized and existing under the laws of Nebraska with its principal place of business at One Valmont Plaza, Omaha, Nebraska 68154-5215. Valmont Industries is subject to personal jurisdiction in the state of Maryland because it is engaged in substantial and not isolated activity within the state and Plaintiff's action arises from Valmont Industries transacting business in Maryland or contracting to supply services or things in Maryland; or committing a tortious act within Maryland; or causing injury to persons or property within Maryland arising out of an act or omission by Valmont Industries while, at or about the time of the injury, Valmont Industries was engaged in solicitation or service activities within Maryland, or products, materials, or things processed, serviced, or manufactured by Valmont Industries were used or consumed within Maryland in the ordinary course of commerce, trade, or use, for which Valmont Industries derived substantial revenue.

3.     In 2013, Defendant Valmont Industries acquired Defendant Armorflex International Limited and its products, including the X-LITE guardrail end terminals involved in the accident at issue in this lawsuit. This acquisition amounted to a merger or de facto merger

wherein liability for defects associated with the Subject Guardrail system was assumed by Valmont.

4. Valmont Industries designs, develops, manufactures, tests, markets, promotes, advertises, distributes, sells, and/or participates in governmental approval processes of guardrail systems installed in Maryland and throughout the United States, including the Subject Guardrail and end terminal. Valmont Industries uses the registered trademark name "X-LITE" to identify its unique and patented highway guardrail end terminals. The X-LITE can be used at the termination of flexible barriers on the shoulder of a roadway or in the median.

5. Defendant VALMONT HIGHWAY, a subsidiary of Valmont Industries, Inc., is a foreign for-profit corporation organized and existing under the laws of Australia with its principal place of business at 57-65 Airds Road, Minto NSW 2566 Australia. Valmont Highway is subject to personal jurisdiction in the state of Maryland because it is engaged in substantial and not isolated activity within the state of Maryland; and Plaintiff's action arises from Valmont Highway transacting business in Maryland or contracting to supply services or things in Maryland; or committing a tortious act within Maryland; or causing injury to persons or property within Maryland arising out of an act or omission by Valmont Highway while, at or about the time of the injury, Valmont Highway was engaged in solicitation or service activities with in Maryland, or products, materials, or things processed, serviced, or manufactured by Valmont Highway were used or consumed within Maryland in the ordinary course of commerce, trade, or use, for which Valmont Highway derived substantial revenue.

6. Valmont Highway, designs, develops, manufactures, tests, markets, promotes, advertises, distributes, sells, and/or participates in governmental approval processes of guardrail systems installed in Maryland and throughout the United States, including the

Subject Guardrail and end terminal. Valmont Highway uses the registered trademark name "X-LITE" to identify its unique and patented highway guardrail end terminals. The X-LITE can be used at the termination of flexible barriers on the shoulder of a roadway or in the median.

7.      Defendant ARMORFLEX INTERNATIONAL LIMITED ("hereinafter Armorflex"), a subsidiary of Valmont Industries, Inc., is a foreign for-profit corporation organized and existing under the laws of New Zealand with its principal place of business at 8 Paul Matthew Road, Auckland 0632, New Zealand. Armorflex was acquired by Valmont Industries Inc., in 2013. Armorflex is subject to personal jurisdiction in the state of Maryland because it is engaged in substantial and not isolated activity . within the state of Maryland; and Plaintiff's action arises from Armorflex transacting business in Maryland or contracting to supply services or things in Maryland; or committing a tortious act within Maryland; or causing injury to persons or property within Maryland arising out of an act or omission by Armorflex while, at or about the time of the injury, Armorflex was engaged in solicitation or service activities with in Maryland, or products, materials, or things processed, serviced, or manufactured by Armorflex were used or consumed within Maryland in the ordinary course of commerce, trade, or use, for which Armorflex derived substantial revenue.

8.      Armorflex designs, develops, manufactures, tests, markets, promotes, advertises, distributes, sells, and participates in governmental approval processes of guardrail systems installed in Maryland and throughout the United States, including the Subject Guardrail and end terminal. Armorflex uses the registered trademark name "X-LITE" to identify its unique and patented highway guardrail end terminals. The X- LITE can

be used at the termination of flexible barriers on the shoulder of a roadway or in the median. Armorflex holds the patent on the X-LITE.

9.    Dallas James is the former owner of Armorflex and the inventor of the X-LITE. Upon information and belief, he is domiciled in New Zealand but makes frequent trips to the United States. Dallas James designed the X-LITE and was substantially involved in the crash testing performed by Safe Technologies in 2011 in order to gain acceptance from the FHWA and the states for the use of the X-LITE's on federal highways. Dallas James, as the inventor and designer of the X-LITE, is intricately aware of its defective nature, and has told others in the roadside safety community that he designed the X-LITE expecting it would only be installed in "third world countries." Dallas James is subject to jurisdiction in this Court because he had a duty but by omission failed to notify Maryland or MassDOT of the defective nature of the X-LITE. This omission within the state caused Subject X-LITE to be installed and to remain on the state's roadway, which caused horrific injuries to the Plaintiff within the state. As the inventor and designer of the X-LITE, Dallas James also collects substantial revenue – including royalties – from the sale of the X-LITE within Maryland.

10.    Defendant LINDSAY CORPORATION (hereinafter "Lindsay Corp") is a foreign corporation, organized in the State of Delaware, which at all relevant times was doing business in the jurisdiction of this Court. Lindsay Corp's principal place of business is located at 222 North 111th Street, Omaha, Nebraska 68164. Lindsay Corp is subject to personal jurisdiction in the state of Maryland because it is engaged in substantial and not isolated activity within the state of Maryland; and Plaintiff's action arises from Lindsay Corp transacting business in Maryland or contracting to supply services or things in Maryland; committing a tortious act within Maryland; or causing injury to persons or property within Maryland arising

out of an act or omission by Lindsay Corp while, at or about the time of the injury, Lindsay Corp was engaged in solicitation or service activities within Maryland, or  products, materials, or things processed, serviced,  or manufactured  by Lindsay Corp were used or consumed within Maryland in the ordinary course of commerce, trade, or use, for which Lindsey Corp derived substantial revenue.

11.    Lindsay Corp designs, develops, manufactures, tests, markets, promotes, advertises, distributes, sells, and participates in governmental approval processes of guardrail systems installed in Maryland and throughout the United States, including the Subject Guardrail and end terminal. Lindsay Corp. uses the registered trademark name "X-LITE" to identify its unique and patented highway guardrail end terminals. The X-LITE can be used at the termination of flexible barriers on the shoulder of a roadway or in the median. Lindsay Corp. holds the license and the trademark to the patented X- LITE.

12.    Defendant LINDSAY TRANSPORTATION SOLUTIONS INC. (hereinafter "Lindsay Transportation") is a foreign corporation, organized in the State of California, and is a directly and/or indirectly wholly owned subsidiary and/or operational unit or division of Lindsay Corp, which at all relevant times was doing business in the jurisdiction of this Court. Lindsay Transportation's principal place of business is located at 180 River Road, Rio Vista, California 94571. Lindsay Transportation is subject to personal jurisdiction in the state of Maryland because it is engaged in substantial and not isolated activity within the state of Maryland; and Plaintiff's action arises from Lindsay Transportation transacting business in Maryland or contracting to supply services or things in Maryland; or committing a tortious act within Maryland; or causing injury to persons or property within Maryland arising out of an act or omission by Lindsay Transportation while,  at or about the time of the injury, Lindsay

6

Transportation was engaged in solicitation or service activities with in Maryland, or products, materials, or things processed, serviced, or manufactured by Lindsay Transportation were used or consumed within Maryland in the ordinary course of commerce, trade, or use, for which Lindsey Corp derived substantial revenue.

13.     Lindsay Transportation designs, develops, manufactures, tests, markets, promotes, advertises, distributes, sells, and participates in governmental approval processes of guardrail systems installed in Maryland and throughout the United States, including the Subject Guardrail and end terminal. Lindsay Transportation uses the registered trademark name "X-LITE" to identify its unique and patented highway guardrail end terminals.

14.     Defendant BARRIER SYSTEMS, INC. (hereinafter "Barrier Systems") is a foreign corporation, organized in the State of California, and is a directly and/or wholly owned subsidiary and/or operational unit or division of Lindsay Corp., which at all relevant times was doing business in the jurisdiction of this Court.  Barrier Systems' principal place of business is located at 180 River Road, Rio Vista, California 94571. Barrier Systems is subject to personal jurisdiction in the state of Maryland because it is engaged in substantial and not isolated activity within the state of Maryland; and Plaintiff's action arises from Barrier Systems transacting business in Maryland or contracting to supply services or things in Maryland; or committing a tortious act within Maryland; or causing injury to persons or property within Maryland arising out of an act or omission by Barrier Systems while, at or about the time of the injury, Barrier Systems was engaged in solicitation or service activities with in Maryland, or products, materials, or things processed, serviced, or manufactured by Barrier Systems were used or consumed within Maryland in the ordinary course of commerce, trade, or use, for which Barrier Systems derived substantial revenue.

15.     Barrier Systems designs, develops, manufactures,  tests, markets, promotes, advertises, distributes, sells, and participates in governmental approval processes of guardrail terminals in Maryland and throughout the United States, including the Subject Guardrail and end terminal.

16.     SAFE TECHNOLOGIES INC. is a wholly owned subsidiary of Barrier Systems and Lindsay Corporation and is incorporated in California and located in Rio Vista, California. Safe Technologies is a crash testing facility that purported to crash test the X-LITE to the NCHRP Report 350 standards, but fraudulently allowed the X-LITE to be substantially and continuously altered between and during the testing such that no version of the X-LITE currently on the roads has actually been crash tested to NCHRP Report 350 standards.  Safe Technologies knew the X-LITE was not crash tested to NCHRP Report 350 standards, and that the X-LITE is unsafe and should not be sold as an energy absorbing terminal anywhere, but Safe Technologies failed to notify Maryland DOT of the fraud in crash testing or to notify Maryland officials that the X-LITE is unsafe as it does not perform safely nor does it actually absorb energy.  This omission in this state caused tortious injury to the Plaintiff by allowing the X-LITE to be placed on Maryland roads and to remain on Maryland roads, such that Plaintiff and dozens of others have been gravely injured by the X-LITE on Maryland' roadways.

17.     Valmont Industries Inc., Valmont Highway, Armorflex Int'l Ltd., Lindsay Corporation, Safe Technologies Inc., Lindsay Transportation Solutions Inc. Dallas James and Barrier Systems, are referred to collectively as "Lindsay" or "Lindsay Defendants."

18.     Green Acres Contracting, Collinson, Inc., L.S. Lee Inc., and Penn Line Services are all certified guardrail and attenuator installers on the public roadways of Maryland by the department of transportation.  Plaintiff has named each company in the alternative until it can be

determined which company installed the X-Lite end terminal that killed Michael Anthony Carter Jr. on U.S. Route 13/ Ocean Highway in Maryland (hereafter "the X-Lite Installer").

19.     Green Acres Contracting is a Pennsylvania corporation located at 148 Pennsylvania Avenue, Scottdale, Pennsylvania 15683 with an agent for service of process: D. Robert Enten, 113 South Third St., Oakland MD 21550. Green Acres Contracting is a certified installer for the state of Maryland's department of transportation.

20.     Collinson, Inc. is a Pennsylvania corporation located at 1773 Pottstown Pike, Glenmoore, Pennsylvania 19343, with a registered agent for service of Markus G. Tittel, 220 Conowingo Road, Conowingo, MD 21918. Collinson is a certified installer for the state of Maryland's department of transportation.

21.     L.S. Lee Inc. is a Pennsylvania corporation with a principal place of business at 150 South Sumner St., York, PA 17405 and a registered agent for service of CSC-Lawyers incorporating service company, 7 St. Paul Street, Suite 820, Baltimore MD 21202. L.S. Lee is a certified installer for the state of Maryland's department of transportation.

22.     Penn Line Service Inc. is a Pennsylvania corporation with its principal place of business at 300 Scottdale Ave., Scottdale, PA 15683, and a registered agent for service at The Corporation Trust Inc., 2405 York Road, Suite 201, Lutherville Timonium, MD 21093. Penn Line is a certified guardrail installer for the Maryland department of transportation.

## SUBJECT MATTER JURISDICTION AND VENUE

23.     Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a). Diversity exists because the citizenship of Plaintiff is Maryland as the personal representative of an estate is deemed to have the same citizenship as decedent's domicile, and none of the Defendants are

citizens of Maryland.

24.      Venue is proper in this Court under 28 U.S. Code § 1391(b)(2) because the

incident that led to Michael Anthony Carter Jr.'s death occurred in Maryland, Michael Anthony

Carter Jr. lived in Gwynn Oak, Maryland, and the defendants regularly conduct business in

Maryland and either sold the product that killed the decedent for use on Maryland's roadways, or

installed the product that killed the decedent on Maryland's roadways.

## ALLEGATIONS COMMON TO ALL COUNTS

25.      On or about 9:28 a.m. on February 7, 2018, on U.S. Route 13 or Ocean Highway

in Maryland, Michael Carter was headed to a recruiting detail for the U.S. Marine Corps in

Salisbury, Maryland when his car left the road and hit an X-Lite end terminal manufactured and

sold by Defendants.  Mr. Carter's car was traveling at approximately 42 mph when its driver's

side door hit the end terminal.  The end terminal pierced through the door and caused multiple

injuries to Mr. Carter, resulting in his death.

26.      Though the Lindsay Defendants sold the the X-Lite as an energy absorbing

terminal that would stop a vehicle within 30 to 50 feet, Mr. Carter's car was not stopped, but was

pierced by the guardrail which sliced through the door and killed Mr. Carter.

27.      The X-Lite is defective in that it has a propensity to spear vehicles, as the design

allows the guardrail to be separated from the posts and the system is inadequately designed to

safely contain the separated guardrail.  The design of the X-LITE, including (but not limited to)

its reliance upon shear bolts that don't always shear, or that shear out of sequence, leaves

exposed blunt guardrail ends to spear vehicles during collisions, posing a grave risk of death or

amputation to vehicle occupants.

28.      Furthermore, the defective design of the X-LITE means that even a "functioning"

X-Lite system is inadequate to absorb the energy of an impacting vehicle even if the X-LITE performs as designed and telescopes down the entire length of the 37.5-foot or 50-foot system. In these cases, X-LITE cannot and does not adequately slow down or stop a vehicle, resulting in a vehicle that continues to have forward momentum when the X-LITE system "ends" or fails, such that the vehicle can be pierced by the blunt end of the guardrail or may rollover.   In Plaintiff's case, the car was pierced and rolled over.

### THE DEFECTIVE X-LITE IS RESPONSIBLE FOR PLAINTIFF'S INJURIES

29.    During the collision, the X-LITE end terminal failed to perform its intended safety function due to defects in its design, manufacturing, and/or installation. Specifically, the X-LITE guardrail failed to properly perform/telescope or to absorb energy upon impact. As a result, when the X-LITE end terminal was  impacted by Mr. Carter's car, it was not able to maintain its integrity and stop or even to substantially slow the vehicle, thus allowing the W-beam guardrail to pierce through the Mr. Carter's car's exterior and frame, and enter the occupant compartment and severely injure Mr. Carter.

30.    Mr. Carter was properly licensed, familiar with his vehicle, not under the influence of any alcohol or drugs, was not exceeding the speed limit, and was not talking or texting on his phone at the time of the accident.

31.    A properly functioning guardrail should not make an accident more dangerous for an occupant. However, in many impacts involving an X-Lite, the victim is killed or maimed by the guardrail, but would have walked away unscathed if the X-LITE had not been defective.

32.    The X-Lite's defects can be traced back to its deficient development and testing process.

33.    Lindsay knows that the X-LITE is inherently unsafe and that vehicle collisions are

likely to result in catastrophic injury given the fact that its product failed multiple crash tests, marginally passed other crash tests, and was never tested in the configuration that Lindsay placed on the roadways.  Moreover, Lindsay is aware of the horrific injuries caused by the defective X-LITE in real world crashes, and Lindsay is aware that the X-LITE's defects are responsible for these injuries and deaths, yet Lindsay continues to obscure, obfuscate and deny that its design is at fault, in a bald attempt to avoid taking financial or moral responsibility for the injuries and deaths caused by its product.

34.    During the NCHRP 350 certification testing, the X-Lite failed **eight** out of **thirteen** tests. It is clear that Lindsay was 'making it up' as they went along in order to tweak their product so that it could technically and allegedly pass the tests, without any regard to developing a product that was inherently safe for the motoring public.

35.    Lindsay's conscious failure to exercise due care in the development and testing of the X-Lite is further highlighted by the fact that the company that tested, evaluated, and judged the X-Lite, Safe Technologies, Inc. (STI), is actually a subsidiary of Lindsay. Moreover, the test facility manager during that time had no prior experience summarizing test data and putting together reports. In fact, he had not been involved in making the determination of whether a test was passed prior to having joined STI. Evidence has established that Lindsay relied on the inexperienced manager at STI to evaluate not only whether a failure occurred in the system, but the reasons why that failure occurred.  In fact, Safe Technologies relied upon Lindsay to determine whether or not the testing passed, when testing facilities have an obligation to exercise independence and not to allow the entity that owns the tested product to determine whether or not the testing is successful.

36.    These testing issues are in addition to the overall defectiveness of the X- Lite

concept, the dangerousness of which a person of ordinary reason and prudence would have recognized as a substantial and unjustifiable risk.  For example, the system is inherently limited in its ability to properly telescope by the number of panels that have sheer bolts.   Once those panels are exhausted, the system is physically incapable of providing anymore protection to the motorist. It is also limited in its ability to properly telescope by, as Lindsay admits, the need for the real-world crash characteristics to be identical to the controlled crash tests in order for the X-Lite to be reliably expected to telescope as intended. The following is a non-exhaustive list of the myriad of other issues that exist with the X-Lite:

> a.    The energy absorbing friction technology does not demonstrably absorb much energy. The low levels of energy absorption allow telescoping of the panels at high speeds until the vehicle reaches a standard panel outside the terminal, which is likely (and does) lead to vehicle penetration.
>
> b.    High energy impacts often tend to separate the telescoping panels, leaving the blunt end of upstream guardrail panels exposed, again resulting in a high probability of vehicle penetration.
>
> c.    The small impact head design allows it to easily lodge itself in the engine compartment. For small angle impacts, this restriction can create a large enough stress to actually separate the telescoping panels, likely leading to vehicle penetration.

37.    Moreover, evidence has established that Lindsay blamed installation defects for increasing the risk of spearing or penetration in  accidents and has claimed that there was a more than 90% installation defect rate throughout three different audits that were conducted on approximately 600 randomly selected X-Lites throughout the  country.

13

38.     Many of the alleged "installation defects" identified by Lindsay were not actually installation defects.  Instead, Lindsay made undisclosed changes to the X-LITE after the FHWA found that X-LITE had passed the certification testing (which itself was based upon fraud by Lindsay).  After making the undisclosed changes to the X-LITE, Lindsay contacted various state DOTs to inform them that the X-LITEs had been improperly installed, when, in fact, the Lindsay actually sought to incorporate its undisclosed changes into existing X-LITES.

39.     For instance, Lindsay's installation manuals clearly showed in photos and diagrams submitted to the FHWA that no post bolt was to be installed on Post 7 to attach the guardrail to the post.  Yet, a post bolt at Post 7 had been used in every crash test performed in the NCHRP Report 350 certification testing performed by Safe Technologies in 2011 and Dallas James, the inventor of the X-LITE and owner of ArmorFlex, filed patents in New Zealand and the U.S. demonstrating that a Post bolt in Post 7 is critical to the proper performance of the X-LITE.

40.     Rather than admit that it had failed to properly report the need for a post bolt at Post 7 when it sought approval from the FHWA, or to properly include instructions in its installation manual to add a post bolt in Post 7, Lindsay wrongly and fraudulently blamed installers for the fact that no post bolt was placed at Post 7.

41.     This fraud was perpetrated on multiple states and involved multiple changes made post-FHWA acceptance by Lindsay to the X-LITE.

42.     Correspondence with various states establishes that Lindsay believed that the as-approved X-LITE was unsafe and defective and that the secret, post-acceptance changes made by Lindsay were critical to the proper performance of the X-LITE.  But rather than issue a recall or notify the states of the defective nature of the X-LITE, Lindsay sought to secretly "correct" the many defects with the X-LITE by performing sham "installation audits" of the terminal, then

14

blaming installers for failing to install the post-acceptance changes, despite the fact that the post-acceptance changes were not part of the installation manuals used by installers.

43.     These sham audits resulted in thousands of already-installed X-LITES being altered on the roads, including in Maryland, such that the terminals in no way resemble the drawings and configuration of the X-LITE submitted to the FHWA for approval by Lindsay.  Lindsay also failed to crash test the post-acceptance changes and had no reason to believe the changes would actually fix the defective propensities of the X-LITE, and the changes did not, in fact, correct the inherently defective X-LITE.

44.     Moreover, Lindsay was on notice about a variety of OSls (Other Similar Incidents) and concerns about the X-Lite that preceded the Plaintiff's accident. The Virginia DOT conducted its own testing on the X-Lite utilizing a 5° angle, and then promptly notified Lindsay that it was removing the X-Lite from its QPL (Qualified Product List) on September 1, 2016 based on the troubling results. Over the next eight months, nine other states would ban the X-Lite. There is no state in the country that permits the installation of an X-Lite on its roadways .

45.     Although clearly on notice about the multitude of issues surrounding its product, Lindsay made no meaningful attempt to gather information about the X-Lite. Lindsay's blind reliance on state DOTs to passively pass information on was a willfully ignorant method that it knew or should have known would not provide fruitful results. In fact, the evidence has established that Lindsay never provided any training to the installers or the DOTs about how to even identify  whether there was a suspected  failure of the X-Lite in real world crashes so that they could possibly know when and what to report back to Lindsay.

### COUNT I - NEGLIGENCE AGAINST THE LINDSAY DEFENDANTS
### (Survival Action of the Estate of Michael Anthony Carter)

46.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

47.     The Lindsay Defendants owed a duty of reasonable care in the design development, testing, manufacture, assembly, inspection, marketing, distribution, promotion, training, advertisement and sale of the Subject Guardrail so as to avoid exposing Plaintiff to unnecessary and unreasonable risks.

48.     The Lindsay Defendants breached that duty in one or more of the following ways:

a.      By negligently failing to use due care in the design, development, manufacture, assembly, testing, inspection, marketing, promotion, training, distribution, advertising, sale, or processing of the Subject Guardrail and its component parts, in order to avoid    the aforementioned risks to individuals;

b.      By failing to adequately warn foreseeable purchasers, installers, and end users of the unreasonable dangerous and defective condition(s) of the X-LITE end terminal, despite the fact that they knew or should have known of the unreasonably dangerous  condition(s);

c.      By failing to disclose known problems and defects;

d.       By marketing the X-LITE as  safe;

e.       By failing to adequately provide proper and clear installation, repair, maintenance, and/or instruction manuals, and failing to  provide adequate warnings;

f.       By failing to comply with reasonable and necessary guidelines, including those of the Department of Transportation, the Federal Highway

16

Administration, and/or the National Cooperative Highway Research Program (NCHRP);

g.        By failing to design and/or manufacture the X-LITE end terminal according to the specifications and approved by the Department of Transportation, the Federal Highway Administration, and/or the NCHRP;

h.        By failing to make timely corrections to the design of the Subject Guardrail to correct the guardrail system;

i.        By failing to adequately identify and mitigate the hazards associated with the guardrail system in accordance with good engineering practices;

j.        By failing to adequately test the Subject Guardrail system, including the head and rail system, to ensure it provided foreseeable owners and passengers of the motoring public with reasonable safety in foreseeable impacts;

k.        By manipulating, misrepresenting, and/or concealing testing data pertaining to the Subject Guardrail system;

l.        By failing to disclose known problems and defects;

m.        By failing to meet or exceed internal corporate guidelines;

n.        By failing to recall the guardrail system or, alternatively, retrofitting the guardrail system to provide reasonable safety for the motoring public; and

o.        By failing to recall the X-LITE end terminal to enhance safety.

49.    As a direct and proximate result of the Lindsay Defendants negligence, Michael

Anthony Carter suffered horrific injuries that caused his death and the Defendants are responsible for the resulting damages of his Estate as set forth below:

> a.   Michael Anthony Carter suffered pain, pre-and post-impact mental anguish, fear, and loss of capacity for the enjoyment of life from the numerous injuries inflicted by the X-LITE and his estate is entitled to compensatory and other damages in an amount exceeding $5 million, plus interest and costs, as allowed under applicable law.

> b.   The estate is also entitled to punitive damages because Lindsay acted in bad faith and with malice in placing the X-LITE on the roads and leaving it there when they knew that it would fail and cause horrific injuries and death in circumstances like those in Mr. Carter's crash.

> WHEREFORE, Plaintiff, Sandra Johnson Carter as Representative of the Estate of Michael Anthony Carter Jr., demands judgment for compensatory damages, punitive damages, interest and costs against the Lindsay Defendants, and requests trial by jury on all issues so triable.

### COUNT II - NEGLIGENCE AGAINST THE LINDSAY DEFENDANTS
#### (Wrongful Death Action on behalf of the Beneficiaries of Michael Anthony Carter)

50.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

51.    At all times relevant hereto, Sandra Johnson Carter was the mother of Michael Anthony Carter Jr. and Michael Anthony Carter Sr. was his father, and as his parents Sandra Johnson Carter and Michael Anthony Carter Sr. are his statutory wrongful death beneficiaries.

52.    As a direct and proximate cause of the Lindsay Defendants' negligence and the

resulting death of Michael Anthony Carter Jr., decedent's statutory wrongful death beneficiaries suffered and will continue to suffer significant loss of services, mental anguish and emotional pain and suffering, and the loss of society of their son, Michael Anthony Carter Jr.

53.    WHEREFORE, plaintiff Sandra Johnson Carter individually and on behalf of the wrongful death beneficiaries of Michael Anthony Carter Jr. demands judgment against the Lindsay Defendants in the full and just amount of $5 million plus interest and costs herein.

## COUNT III- STRICT LIABILITY/DESIGN DEFECT AND FAILURE TO WARN AGAINST THE LINDSAY DEFENDANTS
### (by the Estate of Michael Anthony Carter)

54.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

55.    This is a Count for strict liability/design defect and failure to warn against the Lindsay Defendants.

56.    At all times material to this cause of action, the Lindsay Defendants were in the business of, and gained profits from, the design development, testing, manufacture, assembly, inspection, marketing, distribution, promotion, advertisement, and/or sale of X-LITE guardrail system through the stream of commerce.

57.    At all times material to this cause of action, the Subject Guardrail system was unreasonably dangerous and defective because:

a.    The Lindsay Defendants failed to use due care in the design, development, manufacture, assembly, testing, inspection, marketing, promotion, distribution, advertising, sale, and/or processing of the Subject Guardrail and its component parts, in order to avoid the aforementioned risks to individuals;

19

b.      The Lindsay Defendants failed to adequately warn foreseeable purchasers, installers, and end users of the unreasonable dangerous and defective condition(s) of the X-LITE end terminal, despite the fact that they knew or should have known of the unreasonably dangerous condition(s);

c.      The Lindsay Defendants failed to disclose known problems and defects;

d.      The Lindsay Defendants marketed the X-LITE as  safe;

e.      The Lindsay Defendants failed to adequately provide proper and clear installation, maintenance, and repair instruction manuals, and failed to provide adequate warnings;

f.      The Lindsay Defendants failed to comply with reasonable and necessary guidelines, including those of the State of Maryland, the Maryland Department of Transportation, the Federal Highway Administration, and NCHRP Report 350;

g.      The Lindsay Defendants failed to design and/or manufacture the X-LITE end terminal according to the specifications and approved the Department of Transportation, the Federal Highway Administration, and/or the NCHRP;

h.      The Lindsay Defendants failed to make timely corrections to the design of the Subject Guardrail to correct the guardrail  system;

i.      The Lindsay Defendants failed to adequately identify and mitigate the hazards associate with the guardrail system in accordance with good engineering practices;

j.      The Lindsay Defendants failed to adequately test the Subject

Guardrail system, including the head and rail system to ensure it provided foreseeable owners and passengers of the motoring public with reasonable safety in foreseeable impacts;

k.    The Lindsay Defendants manipulated, misrepresented, and/or concealed testing data pertaining to the Subject Guardrail system;

l.    The Lindsay Defendants failed to disclose known problems and defects;

m.    The Lindsay Defendants failed to meet or exceed internal corporate guidelines;

n.    The Lindsay Defendants failed to recall the guardrail system or, alternatively, retrofit the guardrail system to provide reasonable safety for the motoring public; and

o.    The Lindsay Defendants failed to recall the X-LITE end terminal to enhance safety.

58.    The Lindsay Defendants designed, developed, manufactured, assembled, tested, inspected, marketed, promoted, distributed, advertised, sold, and/or processed the guardrail system and/or its component parts that is the subject of this litigation with unintended and unreasonably dangerous defects, which unintended and unreasonably dangerous defects were present in the guardrail system and/or its component parts when the Defendants placed the guardrail system and/or its component parts into the stream of commerce.

59.    The Lindsay Defendants, as the designer, manufacturer, and distributor of the Subject Guardrail, impliedly warranted that the Subject Guardrail and its componenet parts were merchantable, safe, and fit for ordinary purposes. The Lindsay Defendants are merchants with respect to goods of the kind involved in this incident. The Subject Guardrail, its components

parts, and the warnings and instructions which accompanied the Subject Guardrail, were defective and therefore the Subject Guardrail was not, in fact, merchantable, safe, and fit as warranted by the Lindsay Defendants. The Lindsay Defendants therefore breached these warranties to the plaintiff.

60.    The Subject Guardrail did not undergo any material change or alteration from the time of sale through, up to and including, the time of the aforementioned crash.

61.    The Subject Guardrail was thus unreasonably dangerous and was not reasonably safe for its intended use, subjecting plaintiff's decedent to risks that exceeded the benefits of the Subject Guardrail.

62.    When placed into the stream of commerce, the Subject Guardrail was defective in design making its use more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with other guardrail attenuators or terminal heads that were available for use.

63.    As a direct and proximate result of the design defect, MICHAEL ANTHONY CARTER suffered horrific injuries, pain and suffering, loss of capacity and mental anguish and the Defendants are responsible for his damages.

64.    WHEREFORE, plaintiff as Michael Anthony Carter's mother and as the personal representative of his estate, prays for judgment of a reasonable sum in excess of $5 million, for costs, interest and additional aggravating circumstances damages.

**COUNT IV- STRICT LIABILITY/DESIGN DEFECT AND FAILURE TO WARN AGAINST THE LINDSAY DEFENDANTS**
**(by the WRONGFUL DEATH BENEFICIARIES of Michael Anthony Carter)**

65.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

66.     At all times relevant hereto, Sandra Johnson Carter was the mother of Michael Anthony Carter Jr. and Michael Anthony Carter Sr. was his father, and as his parents Sandra Johnson Carter and Michael Anthony Carter Sr. are his statutory wrongful death beneficiaries.

67.     As a direct and proximate cause of the X-Lite's design defect and the resulting death of Michael Anthony Carter Jr., decedent's statutory wrongful death beneficiaries suffered and will continue to suffer significant loss of services, mental anguish and emotional pain and suffering, and the loss of society of their son, Michael Anthony Carter Jr.

68.     WHEREFORE, plaintiff Sandra Johnson Carter individually and on behalf of the wrongful death beneficiaries of Michael Anthony Carter Jr. demands judgment against the Lindsay Defendants in excess of $5 million plus interest and costs herein.

## COUNT V – BREACH OF IMPLIED WARRANTY AGAINST THE LINDSAY DEFENDANTS (on behalf of the estate of Michael Anthony Carter)

69.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

70.     This is a Count for breach of the implied warranty of merchantability against the Lindsay Defendants.

71.     At all times material to this cause of action, the Lindsay Defendants were in the business of, and gained profits from, the design development, testing, manufacture, assembly, inspection, marketing, distribution, promotion, advertisement, and/or sale of X-LITE guardrail system through the stream of commerce.

72.     At all times material to this cause of action, the Subject Guardrail system was unreasonably dangerous and defective because:

> a.      The Lindsay Defendants failed to use due care in the design, development, manufacture, assembly, testing, inspection, marketing,

promotion, distribution, advertising, sale, and/or processing of the Subject Guardrail and its component parts, in order to avoid the aforementioned risks to individuals;

b.      The Lindsay Defendants failed to adequately warn foreseeable purchasers, installers, and end users of the unreasonable dangerous and defective condition(s) of the X-LITE end terminal, despite the fact that they knew or should have known of the unreasonably dangerous condition(s);

c.      The Lindsay Defendants failed to disclose known problems and defects;

d.      The Lindsay Defendants marketed the X-LITE as  safe;

e.      The Lindsay Defendants failed to adequately provide proper and clear installation, maintenance, and repair instruction manuals, and failed to provide adequate warnings;

f.      The Lindsay Defendants failed to comply with reasonable and necessary guidelines, including those of the State of Maryland, the Maryland Department of Transportation, the Federal Highway Administration, and NCHRP Report 350;

g.      The Lindsay Defendants failed to design and/or manufacture the X-LITE end terminal according to the specifications and approved the Department of Transportation, the Federal Highway Administration, and/or the NCHRP;

h.      The Lindsay Defendants failed to make timely corrections to the design of the Subject Guardrail to correct the guardrail  system;

i.      The Lindsay Defendants failed to adequately identify and mitigate

the hazards associate with the guardrail system in accordance with good engineering practices;

j.      The Lindsay Defendants failed to adequately test the Subject Guardrail system, including the head and rail system to ensure it provided foreseeable owners and passengers of the motoring public with reasonable safety in foreseeable impacts;

k.      The Lindsay Defendants manipulated, misrepresented, and/or concealed testing data pertaining to the Subject Guardrail system;

l.      The Lindsay Defendants failed to disclose known problems and defects;

p.      The Lindsay Defendants failed to meet or exceed internal corporate guidelines;

q.      The Lindsay Defendants failed to recall the guardrail system or, alternatively, retrofit the guardrail system to provide reasonable safety for the motoring public; and

r.      The Lindsay Defendants failed to recall the X-LITE end terminal to enhance safety.

73.    The Lindsay Defendants designed, developed, manufactured, assembled, tested, inspected, marketed, promoted, distributed, advertised, sold, and/or processed the guardrail system and/or its component parts that is the subject of this litigation with unintended and unreasonably dangerous defects, which unintended and unreasonably dangerous defects were present in the guardrail system and/or its component parts when the Defendants placed the guardrail system and/or its component parts into the stream of commerce.

74.    The Lindsay Defendants, as the designer, manufacturer, and distributor of the

Subject Guardrail, impliedly warranted that the Subject Guardrail and its componenet parts were merchantable, safe, and fit for ordinary purposes. The Lindsay Defendants are merchants with respect to goods of the kind involved in this incident. The Subject Guardrail, its components parts, and the warnings and instructions which accompanied the Subject Guardrail, were defective and therefore the Subject Guardrail was not, in fact, merchantable, safe, and fit as warranted by the Lindsay Defendants. The Lindsay Defendants therefore breached these warranties to the plaintiff.

75.    The Subject Guardrail did not undergo any material change or alteration from the time of sale through, up to and including, the time of the aforementioned crash.

76.    The Subject Guardrail was thus unreasonably dangerous and was not reasonably safe for its intended use, subjecting plaintiff's decedent to risks that exceeded the benefits of the Subject Guardrail.

77.    When placed into the stream of commerce, the Subject Guardrail was defective in design making its use more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with other guardrail attenuators or terminal heads that were available for use.

78.    As a direct and proximate result of the Lindsay Defendants' breach of the implied warranty of merchantability, MICHAEL ANTHONY CARTER suffered horrific injuries, pain and suffering, loss of capacity and mental anguish and the Defendants are responsible for his damages.

79.    WHEREFORE, plaintiff as Michael Anthony Carter's mother and as the personal representative of his estate, prays for judgment of a reasonable sum in excess of $5 million, for costs, interest and additional aggravating circumstances damages.

## COUNT VI- BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY AGAINST THE LINDSAY DEFENDANTS
### (by the WRONGFUL DEATH BENEFICIARIES of Michael Anthony Carter)

80.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

81.     At all times relevant hereto, Sandra Johnson Carter was the mother of Michael Anthony Carter Jr. and Michael Anthony Carter Sr. was his father, and as his parents Sandra Johnson Carter and Michael Anthony Carter Sr. are his statutory wrongful death beneficiaries.

82.     As a direct and proximate cause of the Lindsay Defendants' breach of the implied warranty of merchantability and the resulting death of Michael Anthony Carter Jr., decedent's statutory wrongful death beneficiaries suffered and will continue to suffer significant loss of services, mental anguish and emotional pain and suffering, and the loss of society of their son, Michael Anthony Carter Jr.

83.     WHEREFORE, plaintiff Sandra Johnson Carter individually and on behalf of the wrongful death beneficiaries of Michael Anthony Carter Jr. demands judgment against the Lindsay Defendants in excess of $5 million plus interest and costs herein.

## COUNT VII - NEGLIGENCE AGAINST THE XLITE INSTALLER
### (Survival Action of the Estate of Michael Anthony Carter)

84.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

85.     The X-Lite Installer owed a duty of reasonable care in choosing an attenuator or terminal head system for installation on U.S. Route 13 so as to avoid exposing Plaintiff to unnecessary and unreasonable risks or injury.

86.     The X-Lite Installer breached that duty by choosing to install the X-Lite system

despite the X-Lite's history of maiming and killing motorists from the time it was first installed on highways around the country.

87.    As an installer of highway safety products, the X-Lite Installer had a duty to conduct a reasonable inquiry into the safety history of each product prior to choosing an impact attenuator to install on Maryland's highways.

88.    As an installer of highway safety products, the X-Lite Installer knew or should have known about the abysmal safety history of the X-Lite terminal head.

89.    As an installer of highway safety products, the X-Lite Installer had a duty to the motoring public to put their safety before the profit motives of the X-Lite Installer.

90.    The X-Lite Installer breached its duty when it chose and installed the X-Lite terminal head for installation on U.S. Route 13 in Maryland.

91.    As a direct and proximate result of the X-Lite Installer's negligence, Michael Anthony Carter suffered horrific injuries that caused his death and the Defendants are responsible for the resulting damages of his Estate as set forth below:

      a.    Michael Anthony Carter suffered pain, mental anguish, and loss of capacity for the enjoyment of life from the numerous injuries inflicted by the X-LITE and his estate is entitled to compensatory and other damages in an amount exceeding $5 million, plus interest and costs,  as allowed under applicable law.

WHEREFORE, Plaintiff, Sandra Johnson Carter as Representative of the Estate of Michael Anthony Carter Jr., demands judgment for compensatory damages, interest and costs against the Lindsay Defendants, and requests trial by jury on all issues so triable.

## COUNT VIII - NEGLIGENCE AGAINST THE X-LITE INSTALLER
### (Wrongful Death Action on behalf of the Beneficiaries of Michael Anthony Carter)

92.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

93.     At all times relevant hereto, Sandra Johnson Carter was the mother of Michael Anthony Carter Jr. and Michael Anthony Carter Sr. was his father, and as his parents Sandra Johnson Carter and Michael Anthony Carter Sr. are his statutory wrongful death beneficiaries.

94.     As a direct and proximate cause of the X-Lite Installer's negligence and the resulting death of Michael Anthony Carter Jr., decedent's statutory wrongful death beneficiaries suffered and will continue to suffer significant loss of services, mental anguish and emotional pain and suffering, and the loss of society of their son, Michael Anthony Carter Jr.

95.     WHEREFORE, plaintiff Sandra Johnson Carter individually and on behalf of the wrongful death beneficiaries of Michael Anthony Carter Jr. demands judgment against the Lindsay Defendants in the full and just amount of $5 million plus interest and costs herein.

## COUNT IX- PUNITIVE DAMAGES AGAINST THE LINDSAY DEFENDANTS
### (on behalf of Michael Anthony Carter's estate)

96.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

97.     The Lindsay Defendants acted with actual malice and actually knew of the defective and dangerous condition of the X-Lite end terminal system at the time the X-Lite system was first crash tested;

98.     The X-Lite's propensity to fail such that it would kill vehicle occupants was further confirmed by crash testing performed by the Lindsay Defendants in 2015 and 2016.

99.     The X-Lite's propensity to fail and to spear vehicles was confirmed by dozens of

such crashes that started to occur soon after states started putting the X-Lite on the roadways;

100. With this actual knowledge of the X-Lite's defective and dangerous condition, the Lindsay Defendants consciously or deliberately disregarded the potential harm to the traveling public;

101. Despite their actual knowledge of the X-Lite's defective and dangerous condition, the Lindsay Defendants (a) continued to market the X-Lite for use on public highways, and (b) never implemented a recall of the X-Lite from the highways.

102. Instead, the Lindsay Defendants with actual knowledge of the defective and dangerous condition falsely denied that the condition existed, thereby subjecting more motorists to the hidden hazards associated with the X-Lite.

103. Wherefore, the Plaintiff has been damaged by the Lindsay Defendants' wrongful conduct as has the general public such that punitive damages are justified and should be imposed against the Lindsay Defendants.

## COUNT X – PUNITIVE DAMAGES AGAINST THE LINDSAY DEFENDANTS
### (Wrongful Death Action on behalf of the Beneficiaries of Michael Anthony Carter)

104. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

105. At all times relevant hereto, Sandra Johnson Carter was the mother of Michael Anthony Carter Jr. and Michael Anthony Carter Sr. was his father, and as his parents Sandra Johnson Carter and Michael Anthony Carter Sr. are his statutory wrongful death beneficiaries.

106. As a direct and proximate cause of the Lindsay Defendants' actual malice as outlined above and the resulting death of Michael Anthony Carter Jr., decedent's statutory wrongful death beneficiaries suffered and will continue to suffer significant loss of services,

mental anguish and emotional pain and suffering, and the loss of society of their son, Michael Anthony Carter Jr.

107.    WHEREFORE, plaintiff Sandra Johnson Carter individually and on behalf of the wrongful death beneficiaries of Michael Anthony Carter Jr. respectfully request that punitive damages be imposed on the Lindsay Defendants in an amount to deter future wrongful conduct by the Lindsay Defendants and in an amount to compensate the wrongful death beneficiaries and the public for the consequences of the Lindsay Defendants' malice.

WHEREFORE, Plaintiff, SANDRA JOHNSON CARTER as REPRESENTATIVE OF MICHAEL ANTHONY CARTER'S ESTATE and on behalf of the statutory wrongful death beneficiaries demands judgment for compensatory damages, punitive damages, interest and costs against the Lindsay Defendants, and requests trial by jury on all issues so triable.

## THE PLAINTIFF HEREBY DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE

February 4, 2021

Respectfully Submitted,

 /s/Daniel R. Lanier,Esq.            
Daniel R. Lanier, Esq.,
Fed. Bar Roll No. 04504
**MILES & STOCKBRIDGE**
10 Light Street
Baltimore, Maryland  21202
Phone: (410) 385-3651
dlanier@milesstockbridge.com

Richard J. Sullivan
Thomas P. Kelley
*Applications for admission pending*
**SULLIVAN & SULLIVAN, LLP**
83 Walnut Street
Wellesley, MA  02481
(781) 263-9400
rsullivan@sullivanllp.com
epalazzolo@sullivanllp.com
tkelley@sullivanllp.com


Teresa A. Monroe,
*application for admission pending*
**MONROE LAW LLC**
90 State Street, Ste. 700
Albany, New York  12207
(518) 676-0206
(518) 320-8038 (fax)
tmonroe@monroelawllp.com